RAYMOND HESTBECK v. HENNEPIN COUNTY
AND ANOTHER.

212 N. W. 2d 361.

October 26, 1973—Nos. 43729, 43743.

420

*Mahoney, Dougherty, Angell & Mahoney* and *John F. Angell*, for appellant county.

*Meagher, Geer, Markham, Anderson, Adamson, Flaskamp & Brennan, O. C. Adamson II,* and *Mary Jeanne Coyne,* for appellant Coulon.

*Feinberg, Mirviss, Meyers, Schumacher & Malmon* and *James J. Schumacher,* for respondent.

Heard before Knutson, C. J., and Rogosheske, Peterson, and MacLaughlin, JJ. Reconsidered en banc.

ROGOSHESKE, JUSTICE.

This is a medical malpractice action arising out of the surgical removal of plaintiff's gallbladder. The jury by special verdict awarded plaintiff $12,500 damages, assessing negligence under our comparative-negligence statute 65 percent against defendant

Thomas F. Coulon, the surgeon, and 35 percent against other employees of Hennepin County General Hospital, an agency of defendant county. Since we hold, contrary to defendants' respective claims of error, that it was not improper to instruct the jury that negligence was inferable under the doctrine of res ipsa loquitur; that evidence to sustain the amount of the award and the jury's finding of negligence against defendant county is sufficient; and that plaintiff gave timely notice of claim to the county within the contemplation of Minn. St. 466.05, our notice-of-tort-claim statute, we affirm the judgment and the trial court's post-trial order denying motions for a new trial.

The basic facts are not in dispute. Plaintiff, a 47-year-old air freight handler suffering from symptoms diagnosed as a gallbladder attack but otherwise in good health, was admitted to Hennepin County General Hospital on September 10, 1969. Examination revealed a diseased gallbladder, and plaintiff voluntarily submitted to surgery for its removal, the surgery being performed September 24, 1969, while plaintiff was under general anesthesia.

The operation was performed by two doctors, employees of defendant county's hospital who were in postgraduate surgical training. Dr. Shorey, a junior resident surgeon, began the surgery. He was assisted by Dr. Wigner, an intern, and surgical nurses, with defendant Dr. Coulon, chief resident surgeon, in supervisory charge. When the gallbladder was exposed to visual examination after the incision had been made and surgical drains, clamps, and sponges had been inserted in the wound, Dr. Coulon determined that because of the "inflammation around it" its removal was beyond Dr. Shorey's experience. Dr. Coulon then intervened. He testified that "we changed sides of the table and I took it out." The operation, which took 4 hours and 45 minutes, was one which the jury could find was not unusually difficult, complicated, or prolonged and, except for the unexpected shift of responsibility in performing the surgical removal

and the subsequent loss of a sponge, involved no significant complications.

After removing the gallbladder and surgical drains, clamps, and what he thought were all surgical sponges, Dr. Coulon directed Dr. Shorey to close the incision and left the operating room before the sponge count was taken. While he was still in an adjoining room dictating his surgical report, Dr. Coulon was informed that the sponge count was incorrect and that one sponge, 4 by 8 inches in its pristine state and containing an "opaque" marker intended to show up on X-ray, was missing. He immediately returned to the operating room and for an additional 1 hour and 45 minutes unsuccessfully probed visually and manually within plaintiff's abdominal cavity to locate the missing sponge. During this period a hospital technician, using a portable X-ray machine, took an X-ray picture of plaintiff's abdominal area, including the area where the missing sponge was ultimately found. This X-ray did not reveal the existence of the sponge. Dr. Coulon, following his extensive search, was convinced that no sponge remained in plaintiff and that the nurse's sponge count was incorrect. In any event, if he had any lingering doubts, he concluded it was no longer medically wise to keep plaintiff exposed to the danger of continued anesthesia, and therefore he closed the abdominal cavity and plaintiff was removed to the recovery room.

Upon someone's order (the identity of whom is asserted by defendants as unknown), another X-ray was taken in the recovery room and this film did reveal the existence and location of the missing sponge. Dr. Coulon, however, was not informed of this until 2 days later. At that time, after additional X-rays had been taken, he proceeded, with plaintiff's permission, to reoperate. In this second operation, Dr. Coulon was readily able to retrieve the lost sponge from plaintiff's abdomen after reopening the middle half of the incision.

Plaintiff remained hospitalized until October 29 under daily care and treatment for infection of the surgical wound which

manifested itself following the second operation. On the basis of expert medical testimony, the jury might well have found that the infection was causally related to the second operation. As efforts to caustically close the wound were unsuccessful, plaintiff was required to return to the hospital periodically after his discharge for treatment of the still-open wound. In January 1970, he sought medical treatment from a surgeon in private practice for his still-open wound. He eventually was operated on for the third time to correct a hernia and the defect in the wound caused by the infection. Prior to this last operation, he consulted an attorney on October 30, the day following his discharge from defendants' hospital. A notice of tort claim on his behalf was served upon defendant Hennepin County on November 12, 48 days after the first operation and 14 days after his discharge from the hospital.

Defendant surgeon, joined by defendant county, vigorously contends that where in the course of a surgical operation a sponge count indicates a missing sponge and the surgeon, following skillful and accepted medical procedures in an extensive search for the missing sponge, determines that the patient's welfare requires a termination of the operation even though the sponge has not been found, a lay jury should not be permitted to find malpractice absent competent expert medical testimony that the surgeon deviated from the standard of professional skill and care of other surgeons. They contend that it was error to submit the case to the jury under the doctrine of res ipsa loquitur. We do not agree. Rather, we believe that not only was the circumstantial evidence sufficient to permit the jury to draw an inference of professional negligence but that this is a classic case where, upon plaintiff's timely request, the court was required to instruct on res ipsa to aid the jury in performing its factfinding function.

We do not by these conclusions indicate a deviation from the rule that a surgeon is not an insurer of good results.[1] Moreover,

---

[1] Yates v. Gamble, 198 Minn. 7, 268 N. W. 670 (1936).

the complexities and uncertainties in the practice of medicine justify a continued adherence to the rule that the degree of skill and the standard of care required of a physician in treating his patient, as well as any departure from that standard, must in most cases be evaluated only by others in the medical profession.[2] In short, one claiming medical malpractice cannot ordinarily have his case submitted to a jury without expert testimony supporting his claim of professional negligence. But while our prior cases deal mainly with the application of those rules, they equally demonstrate that such expert testimony is not necessary where the matters to be proved fall within an area of common knowledge and developing lay comprehension of medical techniques and where the results of surgical or medical treatment, viewed in the light of all the circumstances, provide a sufficient evidentiary basis to support an inference of negligence. Swanson v. Chatterton, 281 Minn. 129, 160 N. W. 2d 662 (1968); Fowler v. Scheldrup, 166 Minn. 164, 207 N. W. 177 (1926); Jensen v. Linner, 260 Minn. 22, 108 N. W. 2d 705 (1961).[3] The general rule is well stated in Prosser, Torts (4 ed.) § 39:

"There are, however, some medical and surgical errors on which any layman is competent to pass judgment and conclude from common experience that such things do not happen if there has been proper skill and care. When an operation leaves a sponge in the patient's interior, * * * the thing speaks for itself without the aid of any expert's advice."[4]

"The thing or situation speaks for itself" is usually abbreviated by using the Latin phrase "res ipsa loquitur." It is merely another way of characterizing the minimal kind of circumstantial evidence which is legally sufficient to warrant an inference of negligence.[5] Applying this doctrine and instructing a jury

---

[2] Miller v. Raaen, 273 Minn. 109, 139 N. W. 2d 877 (1966).

[3] See, also, 7 Dunnell, Dig. (3 ed.) § 3325.

[4] In accord, see Louisell & Williams, Trial of Medical Malpractice Cases, § 14.06.

[5] Rule 43.06, Rules of Civil Procedure.

concerning it in an appropriate case are designed to assist plaintiff in discharging his obligation to make out a prima facie case of negligence and to aid the jury in performing its factfinding function. Its effect is to place upon the physician and medical personnel, who have the advantage of knowledge of what was done and its significance—knowledge customarily denied the patient—, the burden of going forward with rebutting evidence to satisfactorily and convincingly explain away those facts and circumstances which otherwise may reasonably support an inference that someone was negligent. It is obvious that the stronger the inference of negligence raised by the circumstantial evidence, the more difficult it is to disprove.[6]

Defendant surgeon insists that, because there was a complete absence of expert testimony on behalf of plaintiff that the surgeon's exhaustive search and decision to close were in any way a deviation from professional standards, the circumstantial evidence is not sufficient to support an inference of negligence on his part. This argument, however, could reasonably have been regarded by the jury as rebutting only the inference of negligence in failing to find the sponge before the incision was closed. It falls short of a demonstration that sufficient precautions had been taken to prevent the loss of the sponge. The only testimony in that regard is that the sponges used contained an opaque thread designed to make them visible to X-rays. The record is silent as to the conduct and the responsibility assumed by each surgeon with respect to the placement of the sponges in plaintiff's abdominal cavity. Indeed, Dr. Shorey was not called to testify. There was no evidence suggesting that the loss of the sponge would have been less likely had defendant surgeon performed the entire operation. Those measures which were taken after losing the sponge in no way obviate his failure to initially take sufficient precautions to prevent the loss. Upon this record and particularly in view of defendants' failure to offer any evidence of precautionary efforts of the surgeons to prevent the loss

---

[6] See, Louisell & Williams, Trial of Medical Malpractice Cases, § 14.08.

426

of the sponge, a jury, even without expert medical testimony, could infer negligence on the part of defendant surgeon with or without the benefit of the res ipsa instruction. See, Fowler v. Scheldrup, *supra*; Jensen v. Linner, *supra*.

It is true, as defendants argue, that the use of res ipsa has not been explicitly ruled on in what may be called the "sponge" cases previously reviewed by this court. An examination of those cases discloses, however, that the procedural aid of that doctrine was not invoked either because of plaintiff's failure to request it, as in Miller v. Tongen, 281 Minn. 427, 161 N. W. 2d 686 (1968), or very likely because the circumstantial evidence without its aid virtually compelled an inference of negligence. Brossard v. Koop, 200 Minn. 410, 274 N. W. 241 (1937); Walker v. Holbrook, 130 Minn. 106, 153 N. W. 305 (1915); Baer v. Chowning, 135 Minn. 453, 161 N. W. 144 (1917). We have nevertheless acknowledged the availability of res ipsa where the occurrence is one which ordinarily does not happen unless someone is negligent and where the other conditions of exclusive control in the defendant and absence of contributory fault by plaintiff are established. See, Hoffman v. Naslund, 274 Minn. 521, 144 N. W. 2d 580 (1966); Miller v. Raaen, 273 Minn. 109, 139 N. W. 2d 877 (1966). Since the evidence in this case clearly permitted a finding of all necessary conditions, we hold that the court properly included res ipsa in its instructions.[7]

■ We have no difficulty in finding sufficient evidentiary support to sustain the amount of damages awarded[8] and defend-

---

[7] Perhaps unique to this case, fairness to defendant surgeon might have been better promoted if the procedural effect of the application of the doctrine of res ipsa were viewed as shifting the burden of proof to defendants as urged in the treatise by Louisell & Williams, Trial of Medical Malpractice Cases, c. XV. One cannot read this record without suspecting that the little evidence of precautions against the loss of the sponge was understandably submerged by the volume and persuasive force of the evidence relating to the skill and care exercised to find it.

[8] The jury award, claimed excessive by both defendants in post-trial motions, has the approval of the trial court. Only defendant county raises the issue on appeal.

ant county's liability therefor. Since all medical personnel were employees of defendant county and thus any negligence of defendant surgeon and those under his control is as a matter of law imputed to defendant county,[9] we find it difficult to understand the parties' insistence urged upon a reluctant trial judge to submit a question designed to ascertain whether any county employee other than defendant surgeon was negligent. The issue nevertheless having been raised, we hold the evidence equally supports an inference of negligence on the part of Dr. Shorey in not preventing the loss of the sponge, as well as a negligent failure of defendant county's employees to promptly report the disclosure of the sponge by the second X-ray (and thus to minimize the chances of infection which resulted from the second operation) and, arguably, their negligence in supplying deficient X-ray equipment for operating room use.[10] Thus, the jury's finding of liability against defendant county apart from defendant surgeon's negligence is justified.

■ One final and admittedly close question concerning the timeliness of plaintiff's service of a notice of claim against defendant county remains. Relying solely on Wibstad v. City of Hopkins, 291 Minn. 206, 190 N. W. 2d 125 (1971), defendant county argues that the 30-day time limit for service of a notice of claim, as required by Minn. St. 466.05, subd. 1,[11] was not

---

[9] See, Synnott v. Midway Hospital, 287 Minn. 270, 178 N. W. 2d 211 (1970).

[10] See, Annotation, 14 A. L. R. 3d 1254.

[11] Minn. St. 466.05, subd. 1, provides: "Every person who claims damages from any municipality for or on account of any loss or injury within the scope of section 466.02 shall cause to be presented to the governing body of the municipality within 30 days after the alleged loss or injury a written notice stating the time, place and circumstances thereof, and the amount of compensation or other relief demanded. * * * No action therefor shall be maintained unless such notice has been given and unless the action is commenced within one year after such notice. The time for giving such notice does not include the time, not exceeding 90 days, during which the person injured is incapacitated by the injury from giving the notice."

tolled by plaintiff's being "incapacitated by the injury from giving the notice." We did not, as defendant county insists, intend in Wibstad to structure a rule or formula by which the incapacity of the injured party in every case is to be determined. Since incapacity is necessarily dependent upon the particular facts and circumstances of each case, such a rule should not, indeed cannot, be formulated. The language in that statute, designed to ameliorate the harshness of the 30-day limitation, manifestly intends a case-by-case determination. Surely the rule of strict construction most recently discussed in Olander v. Sperry & Hutchinson Co. 293 Minn. 162, 197 N. W. 2d 438 (1972), and Almich v. Independent School Dist. No. 393, 291 Minn. 269, 190 N. W. 2d 668 (1971), should not be applied in resolving the fact question of incapacity. While the statute uses the phrase "incapacitated by the injury," this conceivably includes more than a claimant's mere physical inability to investigate, prepare, sign, and serve a sufficient legal notice, or to hire an attorney to do so for him. The harsh results of some of our decisions prior to 1959, when the tolling provision was added to the predecessor statute, dictate that an objective consideration of all the circumstances should be made, including the claimant's mental ability to comprehend his situation, understand what must be done, and be moved to act. Under some circumstances, exemplified by Wibstad, there could be no justifiable reason causally related to the injury for a claimant to fail to act within the 30-day period, while in others, depending on a host of factors, it would be unrealistic to require such action. It must also be recognized that suits based on alleged malpractice, unlike other tort claims for which a municipality may be liable, often require lengthy searches of hospital records, extensive research concerning the significance of medical data, and expert medical advice and evaluation beyond the knowledge of most claimants. Thus, the test for determining incapacity under the statute ought to be what would be required of a reasonably prudent claimant

under the same or similar circumstances. Such a test would give rise to a jury question where either the facts or inferences to be drawn therefrom are conflicting.

In this case, the evidence is not disputed that during his hospitalization and within the 30-day period following the first operation, plaintiff could have physically hired someone to investigate and prepare a legally sufficient notice of claim, but the facts are equally undisputed that he would have had to serve it at a time when he was under the continuing care and treatment of the very municipal defendant and its employees he was accusing of malpractice. It would seem unreasonable, if not absurd, to require a patient while under the care and treatment of a municipal hospital to not only formalize the time, place, and circumstances of his claim of negligence by employees upon whom he must depend to continue to serve him but to threaten public disclosure by filing a suit for damages. The rules of statutory construction to ascertain legislative intent reject such a construction. Minn. St. 645.17(1).

Defendant county's pretrial motion for summary judgment on this very ground was first denied by another judge of the district court, and a similar motion made at the start of the trial and a motion for dismissal made at the close of evidence were denied by the trial judge, but the record is not clear as to the basis for the rulings. Implicit in them, however, is the conclusion that, under the peculiar circumstances, plaintiff should not be required to serve the notice until after his discharge from the hospital. We agree with these rulings and hold that where plaintiff was confined in defendant county's hospital under the constant care and treatment of defendant's employees he was incapacitated within the meaning of the tolling provision of the statute from giving notice until discharge from the hospital, and his notice of claim, although served more than 30 days after his injury, was timely.

Affirmed.

MR. JUSTICE YETKA and MR. JUSTICE SCOTT, not having been members of this court at the time of the argument and submission, took no part in the consideration or decision of this case.